IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

DEANENE RYAN,                    )
                                 )
            Plaintiff,           )
                                 )
      v.                         )  Case No.
                                 )  10-3193-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,              )
                                 )
            Defendant.           )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Deanene Ryan seeks review of the final decision of
the Commissioner of Social Security denying plaintiff's
application for disability benefits under Title XVI of the Social
Security Act ("the Act"). Plaintiff argues that the ALJ erred in
(1) discounting the opinion of plaintiff's treating physician,
Dr. Steven Langguth, (2) failing to consider the opinion of State
consultant Dr. Henry, (3) finding plaintiff's myofascial pain
syndrome a non-severe impairment, (4) improperly evaluating the
dosage, effectiveness, and side effects of plaintiff's medication
and her daily activities, (5) ignoring the third-party testimony,
(6) failing to consider the fact that Missouri Medicaid had found
plaintiff disabled, and (7) finding that plaintiff can do the
full range of sedentary work without significant nonexertional
impairments. I find that the substantial evidence in the record
as a whole supports the ALJ's finding that plaintiff is not
disabled. Therefore, plaintiff's motion for summary judgment

will be denied and the decision of the Commissioner will be affirmed.

## I. *BACKGROUND*

On April 30, 2006, plaintiff applied for disability benefits alleging that she had been disabled since August 25, 2005. Plaintiff's disability stems from cervical disc disease, lumbar disc disease, and myofascial pain syndrome. Plaintiff's application was denied on August 11, 2006. On September 26, 2008, a hearing was held before an Administrative Law Judge. On November 6, 2008, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On April 27, 2010, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir.

1996).  The determination of whether the Commissioner's decision
is supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision.  Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876
F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into
consideration the weight of the evidence in the record and apply
a balancing test to evidence which is contradictory."  Wilcutts
v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v.
Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It
means such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion."  Richardson v. Perales, 402
U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th
Cir. 1991).  However, the substantial evidence standard
presupposes a zone of choice within which the decision makers can
go either way, without interference by the courts.  "[A]n
administrative decision is not subject to reversal merely because
substantial evidence would have supported an opposite decision."
Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

**III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS***

An individual claiming disability benefits has the burden of
proving she is unable to return to past relevant work by reason

of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Com-missioner.

5.   Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert George Horne, in addition to documentary evidence admitted at the hearing.

## A.  *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1989 through 2008:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1989 | $   496.12 | 1999 | $6,151.66 |
| 1990 | 1,413.36 | 2000 | 4,752.17 |
| 1991 | 3,348.02 | 2001 | 583.55 |
| 1992 | 800.31 | 2002 | 0.00 |

| 1993 | 281.02 | 2003 | 253.00 |
|------|--------|------|--------|
| 1994 | 572.17 | 2004 | 227.50 |
| 1995 | 0.00 | 2005 | 0.00 |
| 1996 | 0.00 | 2006 | 0.00 |
| 1997 | 3,091.10 | 2007 | 0.00 |
| 1998 | 4,344.29 | 2008 | 0.00 |

(Tr. at 95).

**Function Report - Adult**

In an undated Function Report, plaintiff reported that her typical day consists of getting up at 7:00 a.m., getting her kids up and ready for school, driving them a block to the bus stop, making coffee, watching television for 30 minutes, and then doing housework in 15- to 30-minute increments until 3:45 to 4:00 when she picks her kids up from the bus stop (Tr. at 113, 294). She does laundry, washes dishes, and vacuums (Tr. at 113, 294). Plaintiff takes care of two inside dogs and two outside dogs, with the help of her children (Tr. at 114, 295). Plaintiff has no problems with personal care (Tr. at 114, 295). She cooks daily, makes complete meals, and it usually takes her about an hour to cook (Tr. at 115, 296). Plaintiff is able to shop for food and household items once or twice a week for 30 to 45 minutes at a time (Tr. at 116, 297). She watches television for two to three hours each day (Tr. at 117, 298).

6

Plaintiff was asked to circle the items affected by her conditions (Tr. at 118, 299). She circled lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration, and using her hands (Tr. at 118, 299). Herniated discs and carpal tunnel syndrome affect her use of hands; her back pain affects all other items (Tr. at 118, 299).

She reported she can walk one half block before needing to rest for five to ten minutes (Tr. at 118, 299). She has no difficulty following instructions, handling stress, or coping with changes in routine (Tr. at 118-119, 299-300).

**Questionnaire - Office of Hearings and Appeals**

In a Questionnaire completed for the Office of Hearings and Appeals on July 14, 2008, plaintiff reported that she can only stand for 15 minutes at a time, can walk for 15 to 20 feet maximum, has trouble carrying a gallon of milk, cannot get comfortable sitting, suffers neck pain when she uses her arms or hands, and cannot mow the grass (Tr. at 157). She wrote that her children have to help her prepare easy meals, she does not wash dishes, she does not mop or vacuum floors, and that she has to use a motorized cart for grocery shopping (Tr. at 157). She only does laundry when she is able, and her children do their own laundry (Tr. at 157). She reported that she can only drive a car

short distances, and that the longest trip she had made in the past year was 15 minutes to her attorney's office (Tr. at 158). She reported that she drives "maybe once a month." (Tr. at 158). When asked what she does on an ordinary day, she wrote, "get up, drink coffee, watch t.v., take naps, try to get comfortable, watch dogs play, oversee what chores need to be done." (Tr. at 158). Finally, plaintiff reported that she cannot work because she cannot stand for more than 10 to 15 minutes, cannot sit for more than 10 to 15 minutes, and cannot get comfortable due to pain (Tr. at 158).

**Statement of Lesa Hashagen**

On July 30, 2008, Lesa Hashagen, a friend of plaintiff's, wrote the following:

> I have known Dee for a few years, she has had problems sitting for any length of time till her back and hips start hurting. She has problems standing for more than 15 or so minutes because of her legs and lower back. The kids help her out a lot so she can get things done.

(Tr. at 178).

**Statement of Richard Mitchell**

On September 3, 2008, Richard Mitchell, a friend of plaintiff's, wrote the following:

> I've known "Dee" about 4 1/2 years. Dee's back has gotten worse in that time. She's in pain a lot. Can't sit comfortably for 10 or 15 min at a time. Her lower back same with standing. Has problems walking more than 20 or more

feet at a time.  Can't lift more than 3 or 4 lbs because of
pain and weakness in neck and arms.  Her kids help her as
much as possible.

(Tr. at 189).

## Statement of Roy Sypolt

On September 11, 2008, Roy Sypolt, plaintiff's roommate (and

her future husband, as she listed him as her husband in her

motion to proceed in forma pauperis on May 18, 2010), wrote the

following:

I have known Dee for about 4 1/2 to 5 years.  We have been
roommates for that long.  She used to be able to keep up the
house every day.  Now her kids do most of the everyday
chores.  I do what I can to help pitch in.  Dee is always in
pain.  She is always up and down throughout the night, does
not sleep good because she hurts.  It upsets her that she
can't be a "normal" mom like she used to be.  She feels that
her children are being cheated.  I usually do the shopping
and run errands.  She does not get out much anymore.  She
hurts too bad because her back and neck.  I have had to help
her walk on more than one occasion.

(Tr. at 187).  Mr. Sypolt is listed as disabled in plaintiff's

motion to proceed in forma pauperis, receiving SSI disability.

## Statement of Beverly Roberts

On September 11, 2008, Beverly Roberts, plaintiff's friend,

wrote the following:

I have known Dee for over 5 years.  We used to be able to go
places with our kids like camping, swimming, fishing, but
now it's hard for her to stay put.  Her arms are always
aching and they go numb a lot.  She has problems turning her
neck side to side and has shooting pain throughout her
shoulders.  I hardly get to see her anymore.  She has to
stay home.  She also cannot sit longer than 15 minutes
without having to stand because of the pain in her lower

backs, hip, legs.  She has to have help walking if she has
to walk more than 20 feet due to the pain in hips and lower
back.  Most of the time she has to sit and rest.

(Tr. at 191).

## Physician's Statement for Disabled License Plates/Placard

On August 29, 2009, Steven Langguth, M.D.,[1] signed a
Physician's Statement for Disabled License Plates/Placard (Tr. at
181).  He checked a box next to: "The person cannot ambulate or
walk 50 feet without stopping to rest due to a severe and
disabling arthritic, neurological, orthopedic condition, or other
severe and disabling condition."  He noted that the disability
was temporary, not permanent, and wrote in "3/1/09" as the
expiration date for the disability.

## B.    *SUMMARY OF MEDICAL RECORDS*

In August 2005, the month she claims her disability began,
plaintiff presented to Janet Encarnacion, M.D., (in Dr.
Langguth's office) with complaints of shoulder, back, hip, and
leg pain (Tr. at 209).  Because plaintiff said Tylenol and
ibuprofen did not help, Dr. Encarnacion prescribed Lorcet, a
narcotic (Tr. at 209).

Two months later, in October 2005, plaintiff returned to Dr.
Encarnacion with complaints of left shoulder pain (Tr. at 208).

------

[1]The signature on this form is illegible; however, it
appears it was most likely signed by Dr. Langguth, plaintiff's
treating physician.

Cervical and lumbar spine MRIs revealed moderate degenerative changes in her neck but no evidence of instability (Tr. at 208, 213). Dr. Encarnacion assessed left shoulder pain, recommended that plaintiff undergo injections, and prescribed Lorcet (Tr. at 208).

In early November 2005, plaintiff received epidural steroid injections in her left shoulder (Tr. at 225, 271, 278). Later that month, plaintiff told Dr. Encarnacion that the injections had helped somewhat (Tr. at 205). On examination, plaintiff was not in acute distress, her shoulders appeared normal, and she had full rotation with her neck (Tr. at 205). Dr. Encarnacion assessed arthritis and orthopedic disorders of the spine, prescribed hydrocodone (a narcotic), and recommended that plaintiff start treatment with a pain specialist (Tr. at 205).

In December 2005, plaintiff told Dr. Encarnacion that she had been in an automobile accident earlier in the week (Tr. at 204). She continued to complain of pain in her shoulder, arm, and hands; and she said that her medication made her nauseated (Tr. at 204). Although plaintiff moved stiffly and slowly during the examination, she had full range of motion in her neck (Tr. at 204). Dr. Encarnacion believed plaintiff had likely suffered a muscle strain, and she prescribed conservative treatment with hydrocodone (a narcotic) and Celebrex (a non-steroidal anti-

11

inflammatory) (Tr. at 204).

The following month, plaintiff reported that Celebrex was "helping a little," and that she felt "better than last time" (Tr. at 203).

In February 2006 and March 2006, plaintiff returned to Dr. Encarnacion for treatment of cold symptoms and pain medication refills (Tr. at 198-201). In April 2006, Dr. Encarnacion told plaintiff she would not refill her pain medications until plaintiff saw a pain specialist (Tr. at 197).

In April 2006, plaintiff presented to St. John's Spine Center physician Todd Harbach, M.D., for evaluation (Tr. at 215-17). She reported having worsening neck and back pain that was not helped by injections at the pain clinic (Tr. at 215). On examination, plaintiff had a normal gait, could rise up on her heels and toes, and could forward bend and extend with some discomfort (Tr. at 215). She was tender to palpation in her low back, but the remainder of her back was nontender; and she could raise her arms over her head without pain (Tr. at 215-16). Plaintiff also had 5/5 motor strength in all muscle groups, a negative straight-leg raising test, intact reflexes, normal coordination, and palpable dorsalis pedis posterior pulses (Tr. at 215). Dr. Harbach noted that plaintiff's lumbar spine films were "essentially within normal limits," although he indicated

that a recent cervical spine MRI showed degenerative changes at
C5-6 and C6-7, with disc space collapse, anterior and posterior
spurring, and a spondylotic bulge at C5-6 that was causing some
stenosis (Tr. at 216).  He opined that plaintiff's pain
was mainly myofascial in nature and that she could be helped with
sacroiliac joint injections and physical therapy (Tr. at 216-17).

There is no indication in the record that plaintiff ever
received physical therapy treatment.

The following month, in May 2006, plaintiff presented to the
pain clinic for injections (Tr. at 227, 282-86).  Later that
month, plaintiff told Dr. Harbach that the injections had given
her temporary relief (Tr. at 222).  However, she reported that
she continued to have intermittent left shoulder and arm pain
(Tr. at 222).  On examination, plaintiff had a "slightly" right
antalgic gait, but her muscle strength continued to be normal
(Tr. at 222).  Dr. Harbach also noted that an electromyograph
(EMG) nerve conduction study from April 2006 was normal with no
evidence of radiculopathy or carpal tunnel syndrome (Tr. at 222).
Dr. Harbach told plaintiff there was nothing he could do
surgically for her pain, and he recommended that plaintiff return
to the pain clinic for injections (Tr. at 222).

On August 10, 2006, medical consultant Dr. S. Henry
completed a Physical Residual Functional Capacity Assessment (Tr.

at 130-135).  He found that plaintiff could lift 20 pounds

occasionally and ten pounds frequently, stand or walk about six

hours per day, sit for about six hours per day, and had an

unlimited ability to push or pull.  In support of these findings,

Dr. Henry wrote:

> 34 year old dx *[diagnosed]* w/advanced DDD *[degenerative disc disease]* of the cervical spine and mild DDD of the lumbar spine.  Cl's *[claimant's]* condition is treated conservatively with injections and medication.  P.E. *[physical exam]* indicates SLR *[straight leg raising]* is negative bilaterally, strength is 5/5 throughout, DTR's *[deep tendon reflexes]* are 2+ throughout, she has normal coordination.  She has negative clonus, negative Babinski, negative log roll.  Exam of the cervical spine shows she can raise her arms over her head, behind her head, and behind her back w/out much pain.  EMG nerve conduction study was normal, this did not show any radiculopathy and does not show Carpal Tunnel.  In spite of the claimant's condition she retains the ability to perform as noted above.  MER *[medical records]* does not indicate any other conditions that would limit the claimant further.

He found that plaintiff could frequently climb, stoop,

kneel, crouch, or crawl and could occasionally stoop (Tr. at

133).  He found that plaintiff was limited to occasional overhead

reaching with both arms but had an unlimited ability to handle,

finger or feel (Tr. at 133).  She had no environmental

limitations except that she should avoid concentrated exposure to

hazards such as machinery and heights (Tr. at 134).  In support

of these findings, Dr. Henry wrote, "Claimant indicates

limitations due to back pain and carpal tunnel.  In spite of her

allegation, she reports she is able to care for her children,

ages 13 and 7 years old, does household chores, prepares meals, drives, shops and watches tv.  Allegations of persistence and severity of symptoms are partially credible." (Tr. at 135).

On September 15, 2006, plaintiff saw Dr. Encarnacion (in Dr. Langguth's office) for a monthly check up (Tr. at 250).  "Pt is still hurting in the neck but mostly it is in the middle of her back and below her waist radiating into her legs.  R leg wants to give out.  Arms are going numb.  Pt thinks that Dr. Harbach did do NCS *[nerve conduction study]* but unsure what it showed though there may have been carpal tunnel."  On exam plaintiff's back was tender on palpation but she had no muscle spasm.  Straight leg raising was negative.  Her gait and stance was "abnormal antalgic."[2]  The rest of her exam was normal.  Dr. Encarnacion assessed orthopedic disorders of the spine and a backache.

On September 25, 2006, plaintiff saw Dr. Encarnacion for a follow up (Tr. at 249).  Plaintiff complained of worsening back pain.  Dr. Encarnacion checked plaintiff's vital signs, her heart, and her lungs, but did not perform an orthopedic exam. She assessed orthopedic disorders of the spine and a backache. She recommended plaintiff have an MRI.

In October 2006, plaintiff underwent further MRIs, which showed only minimal abnormalities in her lumbar spine and mild-

---

[2]A limp adopted so as to avoid pain on weight-bearing structures, characterized by a very short stance phase.

to-moderate abnormalities in her cervical spine (Tr. at 245-47).

On November 10, 2006, plaintiff saw Dr. Encarnacion to get the results of her MRI (Tr. at 244). She complained of lower back and neck pain. "MRI with disc disease in lumbar and cervical spine most looks same as previous. One area in cervical spine not remarked on if looks any different from previous MRI. Pt says she was waiting [to] hear from referral coordinator about appt back with St. John's Spine Center." Without performing a physical exam, Dr. Encarnacion assessed orthopedic disorders of the spine. She refilled "pain medication" for four weeks.

On December 8, 2006, plaintiff saw Dr. Randy Curl (in Dr. Langguth's office) for a refill of pain medication (Tr. at 243). "Brief visit for medication refills. Discussed with her my preference to find alternative to chronic narcotics due to potential problems with chronic use; will ask to return for annual exam in one month; will obtain labwork to include UDS for compliance; also will discuss with her pharmacy checks if we decide to continue narcotic use. More likely however to find alternative agents more appropriate to long term use." He assessed orthopedic disorders of the spine and a backache.

On January 16, 2007, plaintiff saw Dr. Curl for a follow up (Tr. at 241). "Returns in follow up for chronic pain. Discussed pain management; will continue as is this month, will need expert

opinion (pain clinic) to continue probably will need to be on long acting opiate if going to keep using narcotics for pain management.  She has been to Dr. Ellis, doesn't really want to go back since he 'just wants to stick me with needles.'  Told her that steroid injections are worthwhile.  I've had two and believe in them; she again declines.  Will try to find anther provider to suggest pain regimen appropriate for her.  Will also consider starting neurontin[3] at next visit."  Plaintiff reported hip and back symptoms, neck pain, and arthralgias.  She was not feeling tired or poorly.  Dr. Curl performed a physical exam which was normal except he found tenderness on palpation and muscle spasm in her back.  He assessed only hyperlipidemia (high cholesterol) and ordered blood work.

On February 19, 2007, plaintiff saw Dr. Curl for a refill of her pain medication (Tr. at 239-240).  Plaintiff reported feeling tired or poorly, back symptoms, muscle aches, and stiffness localized to one or more joints.  Dr. Curl performed a physical exam.  He noted that plaintiff was alert and oriented, in no acute distress.  Her physical exam was normal except she had tenderness on palpation and muscle spasm in her back.  "Pain in neck relatively well controlled with current regimen; will add neurontin today in attempt to decrease use of narcotics."

_____

[3]Treats nerve pain.

On March 20, 2007, plaintiff saw Dr. Langguth for medication refills (Tr. at 238). "Needs pain meds refilled. Has not started Neurontin yet. Says she read about it and 'I don't have seizures.'"[4] Plaintiff's lower back exhibited tenderness on palpation. No other exam was done. He assessed a backache and prescribed Norco (acetaminophen and hydrocodone, a narcotic). "Will continue pain meds for now, but emphasized that I plan (like Dr. Curl had suggested earlier) to gradually decrease dose and eventually get off narcotic meds. Explained how Neurontin is being used to help with chronic pain and encouraged her to start taking it now so it can be helping when we start decreasing her narcotics."

On April 18, 2007, plaintiff saw Dr. Langguth for a refill on her pain medication (Tr. at 237). "Hasn't been taking Neurontin because 300 mg even once a day made her very drowsy." He checked her height, weight, and vital signs but did no other examination. He assessed "orthopedic disorders of the spine." He prescribed Norco (acetaminophen and hydrocodone, a narcotic) and Neurontin 100 mg. with two refills.

On May 15, 2007, plaintiff saw Dr. Langguth for a check up and medication refills (Tr. at 236). "No new problems. Needs pain med refills. Even taking Neurontin once a day (at bedtime)

---

[4]Neurontin is also used to treat seizures.

made her too groggy, so she's stopped taking it."  He checked her vital signs, height and weight.  Her lower back exhibited tenderness on palpation on the right and left paraspinal region, muscle spasm of the lower back in the right and left paraspinal region.  He assessed a backache.  He prescribed Norco (narcotic), said his nurse could refill that for the next two months, and that plaintiff would need to come back in three months (Tr. at 236).

On September 5, 2007, plaintiff saw Dr. Langguth for tooth pain, cold symptoms and medication refills (Tr. at 234).  Dr. Langguth checked plaintiff's height and weight, vital signs, mouth, ears, lymph nodes, lungs, and back.  Her lower back exhibited tenderness on palpation of the right and left paraspinal region and muscle spasm in the right and left paraspinal region.  He assessed acute bronchitis and orthopedic disorders of the spine.  He told her to continue her same medication.  He prescribed Norco (narcotic) and Keflex (antibiotic) and told her to see a dentist as soon as possible.  "Will give pain med script and allow her to get refill from my nurse for the next 2 months after that."

On February 19, 2008, plaintiff saw Dr. Langguth for a tooth ache and medication refills (Tr. at 233).  During this visit, Dr.

Langguth assessed periodentitis,[5] esophageal reflux, and
orthopedic disorders of the spine. His physical examination,
however, was limited to plaintiff's vital signs, height, weight,
teeth, and lymph nodes. He prescribed Prilosec OTC (for acid
reflux), Celebrex (non-steroidal anti-inflammatory), Skelaxin
(muscle relaxer), Keflex (antibiotic), and Xopenex HFS
(bronchodilator). Plaintiff also brought in a handicapped
parking form which Dr. Langguth filled out "based on back
problems."

Seven and a half months later, on September 30, 2008,
plaintiff saw Dr. Langguth for back pain "3-4 days ago pain
started to get worse." (Tr. at 332). Dr. Langguth checked
plaintiff's weight and vital signs but did no physical exam. He
assessed a stye in plaintiff's eye and "backache" but did not
prescribe any medication or recommend any treatment.

On October 17, 2008, Dr. Langguth completed a Medical
Questionnaire (Tr. at 292-293, 317-318). He diagnosed orthopedic
disorders of the spine and disc disease of the lumbar and
cervical spine. He found that plaintiff could lift less than
five pounds; stand or walk for 20 to 30 minutes at a time and for
a total of two hours per day; sit for 30 to 60 minutes at a time
but was otherwise unlimited; did not need rest breaks beyond the

---

[5]Periodontitis is inflammation and infection of the
ligaments and bones that support the teeth.

typical 15 minutes in the morning and afternoon and 30 minutes for lunch; was moderately limited in her ability to push and pull with her arms and legs; should never climb balance, stoop, kneel, crouch, or crawl; and had an unlimited ability to reach, handle, finger, and feel.  He found that she should avoid heights and that she should have a lower paced job due to episodes of pain and stiffness.  He surmised that she would be likely to miss four or more days of work per month due to her impairments or their treatment and that plaintiff's complaints of pain and discomfort are "documented by objective findings."  When asked to "describe the principal clinical and laboratory findings, signs, and symptoms or allegations (including pain) which support the above medical opinion", Dr. Langguth wrote, "MRIs show disc disease; physical exam shows pain and spasm in affected area of back."

On January 2, 2009, plaintiff saw Dr. Langguth for a well woman exam (Tr. at 332).  There is no mention in this record of any problems plaintiff was experiencing, and the only medication prescribed was Mucinex D for cough and congestion.

## C.   *SUMMARY OF TESTIMONY*

During the September 26, 2008, hearing, plaintiff testified; and George Horne, a vocational expert, testified at the request of the ALJ.

**1.  Plaintiff's testimony.**

At the time of the hearing plaintiff was 36 years of age and is currently 39 (Tr. at 24).  She was 5'6" tall and weighed 163 pounds (Tr. at 24).  Plaintiff was divorced and had two children, ages 15 and 9 (Tr. at 25-26).  Plaintiff does not get child support but she does get a temporary assistance check through the State of Missouri due to her minor children (Tr. at 26).  Plaintiff was living in a two-bedroom house with her children and a 42-year-old male roommate who receives SSI disability due to being illiterate (Tr. at 27).

Plaintiff left school in the middle of 12th grade (Tr. at 28).  She can read and write, but she physically cannot write for very long (Tr. at 28-29).  Plaintiff previously worked as a cashier in a grocery store and as a manager of a convenience store (Tr. at 27-28).  She worked at a dry cleaners for three months in 2001 but quit that job because of her abusive ex-husband (Tr. at 30).  She worked at Sue Bee Family Foods for six months in 1999 but quit because of her ex-husband (Tr. at 30-31).  She worked for a year at Porter Solo Market as a clerk in 1999 but quit due to her ex-husband (Tr. at 31).  She worked as an Assistant Manager at an Exxon gas station but quit after five or six months because she was pregnant (Tr. at 31).  Plaintiff worked at Taco Bell for about four months in 1992 but was fired

because she had trouble getting to work due to transportation problems (Tr. at 32). Plaintiff worked at Zenith Electronics for seven to eight months, and then the plant closed (Tr. at 32).

Plaintiff left many jobs due to her ex-husband being physically abusive - she could not trust him with her children while she was gone because he would lock them in their bedroom and not let them out all day while she was at work (Tr. at 46-47). When she came home, the house would be a mess and the children would not be dressed (Tr. at 47). She would get the kids ready for school, then go to work and come home to find out that her son had never gone to school (Tr. at 47). Once when her daughter was two, her ex-husband started beating the daughter and plaintiff jumped in and took the beating for her (Tr. at 47).

Plaintiff's children and roommate help with the housework (Tr. at 37). Plaintiff can drive, but she prefers not to (Tr. at 37). When the ALJ asked, "So, you don't have a need, then, for a 90-day handicapped placard?" plaintiff responded, "[W]hen I ride on occasion to like Wal-Mart, when I do get out, it does come in handy to have the handicapped placard." (Tr. at 37). Plaintiff has driven her car once in the past eight or nine months (Tr. at 37).

Plaintiff alleged an onset date of August 25, 2005, because that was the day her pain really started bothering her (Tr. at

33). Plaintiff's treating physician at the time was Dr. Encarnacion (Tr. at 33-34). When that doctor moved to Massachusetts, Dr. Langguth took over (Tr. at 34).

The ALJ noted that plaintiff was limping when she came into the hearing room (Tr. at 36). Plaintiff said that within the past week, her left hip was having problems rotating which affects the way she walks (Tr. at 36).

Plaintiff suffers from constant aching, stiffness, shooting pains in her hip joints and shoulders (Tr. at 38). She has problems opening jars because of stiffness, she cannot lift a gallon of milk herself, and she has trouble writing (Tr. at 38). Her hand goes numb after two or three minutes of writing (Tr. at 38-39). Her arms go to sleep after reaching out in front of her for 60 to 90 seconds (Tr. at 39). Dr. Langguth said that was due to arthritis and swelling in her hands, and it might also be due to nerves being pressed against her neck (Tr. at 39). After Dr. Ellis gave her an injection in her neck, she was not able to use her left arm for two to three weeks (Tr. at 39). The injections "hurt worse than they helped" (Tr. at 40). The injections Dr. Ellis gave plaintiff in her hips provided no relief at all (Tr. at 40).

Plaintiff has sharp, shooting, burning pain and cramps that go down her left arm into her hand (Tr. at 40). Plaintiff

experiences neck pain four or five times a week (Tr. at 41).

Plaintiff was asked whether her medications cause her any significant side effects (Tr. at 41). She said, "Not really, no. The hydrocodone causes nausea occasionally, but that's about it." (Tr. at 41). She experiences nausea once or twice a week but it goes away once she eats something (Tr. at 41).

Plaintiff experiences constant pain on a daily basis (Tr. at 45). With medication, plaintiff's pain is a six or a seven on a scale of zero to ten (Tr. at 45). Without medication, the pain would be an eight or a nine (Tr. at 45). Plaintiff has constant cramps in her lower back (Tr. at 46). Plaintiff is able to sit for ten to 15 minutes at a time and for a total of two to three hours in an eight-hour day (Tr. at 42). Plaintiff can stand for ten to 15 minutes at a time and two to three hours total in an eight-hour day (Tr. at 42). If plaintiff were sitting at a work bench, should could push, pull, lift, or carry on a one-time occasion about three to four pounds (Tr. at 42). Plaintiff could push, pull, lift or carry only three to four pounds 1/3 of time (Tr. at 43). If she had to do it frequently (six and a half hours per workday), the maximum weight she could work with would be one to two pounds (Tr. at 43).

Plaintiff is able to load the washing machine if the basket is carried to the machine for her; she needs help getting clothes

out due to leaning over and the weight of the clothes (Tr. at 43). She does a little sweeping, but her daughter has to finish it for her (Tr. at 43). Plaintiff's daughter does the vacuuming "because she likes to" (Tr. at 43). Plaintiff has to stop and rest when she vacuums (Tr. at 43). Plaintiff's roommate does the grocery shopping (Tr. at 44). If plaintiff goes shopping, she uses an electric cart because she can only walk a few feet at a time due to pain in her hips, back, and legs (Tr. at 44). Plaintiff lies down three to four times a day for 15 to 30 minutes at a time (Tr. at 45). Plaintiff has tried pain patches, Ben-Gay, and hot showers, all without relief (Tr. at 46).

The ALJ asked plaintiff the following:

Q. When I look at the medical reports, Dr. Harbock, who saw you April 12, '06, you complained at that time of back and neck pain that you told him had been getting progressively worse since 2002 or 2003. You complained . . . of numbness and tingling in both hands that woke you at night. You also described low-back pain, mainly over the hips and in the buttock region, made worse by sitting, and lying down actually made it worse.

A. Yes.

Q. Now, he says, at that time, you denied any pain radiating down into your legs or your feet. He reports that, in his opinion, you had a normal gait and a normal ability to do tandem gait. After that examination, he made an appointment for you to be seen by Dr. Pock, and you were to see Dr. Pock on June 27, 2006, but you didn't keep the appointment. Why not?

A. I didn't have any transportation at that time.

26

Q. And he said you were to reschedule.  Did you
   reschedule?

A. I tried to reschedule.  I believe, when I tried to
   reschedule, Dr. Pock was out of the office at that
   time.  If I'm not mistaken.

(Tr. at 47-48).

## 2. Vocational expert testimony.

Vocational expert George Horne testified at the request of
the Administrative Law Judge.  The only hypothetical involved a
person who had the restrictions described by plaintiff in her
hearing testimony (Tr. at 51).  The vocational expert testified
that such a person could not work due to an ability to lift only
three to four pounds occasionally and one to two pounds
frequently and an inability to complete an eight-hour day due to
an excessive need for rest (Tr. at 51).

## V. FINDINGS OF THE ALJ

Administrative Law Judge Arthur Stephenson entered his
opinion on November 6, 2008.

Step one.  Plaintiff has not engaged in substantial gainful
activity since the date of her application (Tr. at 14).

Step two.  Plaintiff suffers from the following severe
impairment:  Disorders of the spine (Tr. at 14).

Step three.  Plaintiff's severe impairment does not meet or
equal a listed impairment (Tr. at 14).

Step four.  Plaintiff has the residual functional capacity to perform the full range of sedentary work (Tr. at 18).  With this RFC, she is unable to return to her past relevant work (Tr. at 17).

Step five.  Since plaintiff has the ability to perform the full range of sedentary work, the Medical Vocational Guidelines direct a finding of not disabled (Tr. at 18).

## VI.  *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible because (1) in one medical record dated July 2008 plaintiff said her hydrocodone made her dizzy, plaintiff testified that hydrocodone causes nausea, and she was unable to take Neurontin due to drowsiness, and (2) the ALJ relied on plaintiff's daily activities but did not acknowledge that her daily activities became more restrictive with time as her condition worsened.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ,

however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered:

Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> In completing a Social Security Administration questionnaire as part of the application for benefits, the claimant stated that she was able to get her children ready for school, drive them to the school bus stop and pick them up there, do housework (including laundry, dish-washing, vacuuming and other cleaning and complete meal preparation), care for 4 dogs, leave her residence 4-5 times a day, drive and ride in a car, go out alone, go shopping in stores 1-2 times a week, manage her finances, watch television and socialize with a friend. She further stated that she was generally able to maintain attention and follow instructions. These statements (which contradict her hearing testimony) show that she engages in a fairly normal range of daily activities and are inconsistent with her allegation of disability.

> The medical records, moreover, do not support the claimant's allegation that she is disabled. The claimant has mild degenerative changes of the lumbar spine and somewhat more serious changes of the cervical spine, but there is no indication of any abnormality that could reasonably be expected to produce the extreme symptomatology she describes. Furthermore, the claimant declined additional injections despite being advised by a primary care physician that they were likely to help her and despite having received some benefit from a trial of sacroiliac joint injections. Similarly, she acknowledged at the hearing that she had been referred to a pain management specialist, but had not kept the appointment with him.

* * * * *

>Finally, the claimant's Social Security Administration
>earnings record reveals that her earnings before the date on
>which she states she became unable to work were sporadic and
>always very low.  This shows that she was not motivated to
>engage in productive activity even prior to the alleged
>onset of disability and also weighs against her credibility.

(Tr. at 16-17).

The one reference in the record to dizziness is not enough

to reverse the ALJ's credibility finding.  Plaintiff continued to

drive; therefore, it is not plausible that her dizziness was so

significant that it would limit her ability to do sedentary work.

Additionally, she did not complain regularly about dizziness;

instead she consistently rejected other forms of treatment in

favor of this medication she now claims caused a measurable side

effect.  And finally, plaintiff testified at the hearing that the

only side effect she experiences is "nausea occasionally, but

that's about it."

Plaintiff's complaint of drowsiness from Neurontin is

likewise not credible.  Plaintiff resisted for months switching

from narcotics to Neurontin.  Her treating physician continued to

prescribe it despite her resistance.  Even after she complained

of drowsiness (upon taking it at bedtime), her treating doctor

continued to prescribe Neurontin.

As for plaintiff's daily activities, she stated in her brief

that "[a] more logical interpretation of the alleged discrepancy

31

between hearing testimony and prior statements is that Ryan's conditions have deteriorated while waiting for a hearing." However, the difference between plaintiff's testimony at the hearing and her original description of her restricted activities in her administrative paperwork cannot be considered in isolation. The ALJ must consider that along with the rest of the record. When the ALJ did this, he concluded that plaintiff was exaggerating her symptoms during the hearing.

Plaintiff's work record is poor and shows little motivation to work even before she became impaired. She never left any job due to an impairment or for any medically-related reason (other than being pregnant). Her husband received disability despite plaintiff being unable to recall any limitations beyond his inability to read, which suggests that plaintiff may have been motivated to seek disability benefits for herself. When plaintiff completed her disability paperwork - believing she was completely unable to perform any substantial gainful activity - she was still able to get her kids ready for school, do housework in 15- to 30-minute increments, make complete meals, cook for an hour at a time, and shop for 30 to 45 minutes at a time.

As far as the medical records, plaintiff told her doctor that steroid injections had helped, and that Celebrex (a non-steroidal anti-inflammatory) helped. However, she failed to go

to a pain specialist until Dr. Encarnacion refused to refill her prescription for pain medications, which indicates she was not very motivated to find a solution to her alleged pain. When plaintiff did go to a pain specialist following Dr. Encarnacion's threat, she told the doctor that the injections had not helped, even though she had told Dr. Encarnacion that the injections had indeed helped. Plaintiff's physical exam at the Spine Center was essentially normal with the exception of some tenderness in her low back. She had full motor strength, negative straight-leg raising, normal lumbar spine films, and a cervical spine MRI with only mild to moderate changes. The doctor believed plaintiff's pain could be treated with injections and physical therapy; however, plaintiff never attended physical therapy, again suggesting that she was not very motivated to improve her condition. This lack of motivation is plausibly because plaintiff's pain was not as debilitating as she later testified.

After receiving injections at the pain clinic, plaintiff reported they had given her temporary relief. Plaintiff's medical records with her treating doctors consistently show normal exams except some tenderness on palpation and sometimes she had a positive muscle spasm but not always. Many times her doctors did not even feel the need to perform physical exams.

Plaintiff's nerve conduction studies showed that she did not have carpal tunnel syndrome; however, she told Dr. Encarnacion that the studies showed that "there may have been carpal tunnel." Plaintiff's MRIs showed only minimal abnormalities in her lumbar spine and mild to moderate abnormalities in her cervical spine.

Plaintiff never saw a doctor more frequently than once a month and that was generally for medication refills. Once she began seeing Dr. Langguth (who continued to refill her narcotic prescriptions), plaintiff decreased her visits to every three months and sometimes would go up to seven months without visiting any doctor.

Plaintiff limped into the hearing room, even though there is no evidence that she ever had a limp before that day. Plaintiff testified that after she received an injection in her neck, she was not able to use her left arm for two or three weeks; however, plaintiff never reported that to any doctor. When the ALJ asked her about missing an appointment with a doctor recommended by Dr. Harbock, she stated that she had not had transportation. When asked why she did not reschedule, she said she believed he was out of the office when she tried to.

Plaintiff testified that her arms go to sleep after reaching out in front of her for 60 to 90 seconds and that Dr. Langguth attributed that to arthritis or swelling. However, Dr. Langguth

found that plaintiff had an unlimited ability to reach in any direction, which suggests that plaintiff never complained to him about an inability reach for more than a minute and a half.

Considering all of the factors outlined above which are found in the rest of the record, the ALJ was justified in determining that the discrepancy between plaintiff's administrative paperwork and her hearing testimony was due to plaintiff's exaggeration in an effort to secure benefits rather than a worsening of symptoms.

## VII. TREATING PHYSICIAN OPINION

Plaintiff argues that the ALJ erred in discrediting the opinion of her treating physician, Steven Langguth, M.D., who found that plaintiff could lift less than five pounds; stand or walk for 20 to 30 minutes at a time and for a total of two hours per day; sit for 30 to 60 minutes at a time but was otherwise unlimited; did not need rest breaks beyond the typical 15 minutes in the morning and afternoon and 30 minutes for lunch; was moderately limited in her ability to push and pull with her arms and legs; should never climb balance, stoop, kneel, crouch, or crawl; and had an unlimited ability to reach, handle, finger, and feel. He found that she should avoid heights and that she should have a lower paced job due to episodes of pain and stiffness. He surmised that she would be likely to miss four or more days of

work per month due to her impairments or their treatment.  The
only parts of Dr. Langguth's opinion which are inconsistent with
the ability to perform sedentary work are his finding that
plaintiff can never lift five pounds or more (sedentary work
requires the ability to lift no more than ten pounds at a time,
but occasionally lift things like docket files, ledgers, and
small tools) and his belief that plaintiff is likely to miss four
days or more per month due to her impairments and their
treatment.

A treating physician's opinion is granted controlling weight
when the opinion is not inconsistent with other substantial
evidence in the record and the opinion is well supported by
medically acceptable clinical and laboratory diagnostic
techniques.  <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005);
<u>Ellis v. Barnhart</u>, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ
fails to give controlling weight to the opinion of the treating
physician, then the ALJ must consider several factors to
determine how much weight to give to the opinion of the treating
physician:  (1) the length of the treatment relationship, (2)
frequency of examinations, (3) nature and extent of the treatment
relationship, (4) supportability by medical signs and laboratory
findings, (5) consistency of the opinion with the record as a
whole, and (6) specialization of the doctor.  20 C.F.R. §

404.1527(d)(2) - (5).

The ALJ had this to say about Dr. Langguth:

Steven Langguth, M.D., a primary care physician who treated
the claimant, opined on October 1, 2008, that the claimant
was limited to lifting/carrying less than 5 pounds, could
not climb, balance, stoop, kneel, crouch or crawl and would
likely miss more than 4 days of work per month due to her
impairments and treatment. However, he additionally opined
that the claimant could stand/walk 2 hours total during an
8-hour work day, could sit without limitation, had no
limitation of the ability to reach, handle, finger or feel
and did not require more than normal rest breaks during an
8-hour work day (i.e., 15 minutes morning and afternoon and
30 minutes for lunch). In February 2008, Dr. Langguth had
completed a physician's statement for a disabled placard.
Like Dr. Encarnacion, he stated that the claimant would be
unable to walk 50 feet without stopping [and that condition
would likely continue] for the next 6 months. However, in
February 2007, he had noted that the claimant reported that
her neck pain was relatively well-controlled with
medication. During the previous month, an associate of Dr.
Langguth had noted that the claimant had seen a pain
management specialist, but did not want to return since "he
just want[ed] to stick [her] with needles." He advised her
that steroid injections were worthwhile, but she again
declined.

* * * * *

As for the opinion evidence, the undersigned has considered
the opinion of Dr. Langguth and has given significant weight
to his statement that the claimant is able to sit without
limitation and is able to stand/walk a total of 2 hours
during an 8-hour work day. However, the undersigned has
disregarded the doctor's statement that the claimant is
limited to lifting/carrying less than 5 pounds, can never
perform postural activities and would probably be absent
from work 4 or more days per month because of her
impairments and treatment, since this is clearly
inconsistent with the claimant's ability to perform
unlimited sitting, stand/walk for 2 hours of an 8-hour work
day and complete an 8-hour day with no more than normal
breaks. These restrictions are also inconsistent with the
other evidence of record, including the claimant's own

37

description of her daily activities, the imaging studies of
her spine and her refusal to pursue pain management
treatment.  The undersigned notes that Drs. Encarnacion and
Langguth opined that the claimant would be "disabled" for a
6-month period for purposes of eligibility for a disabled
parking placard.  However, a 6-month period of disability
would not meet the duration requirement of 20 CFR 416.909,
and the fact that the claimant was unable to walk 50 feet
without stopping (if accurate) would not preclude
employment.

(Tr. at 16-17).

Plaintiff saw Dr. Langguth six times during the 19 months
before he completed the questionnaire at issue.  During those six
visits, on only one was "back pain" her chief complaint.  On five
visits, she indicated she was there for medication refills and on
two of those five visits she also complained of tooth pain.

Turning first to the issue of lifting, on October 17, 2008,
Dr. Langguth noted in the questionnaire that plaintiff could
never lift five pounds.  However, in not one medical record did
he ever note that plaintiff complained of a problem with lifting,
nor did his examination ever uncover a problem with lifting.  In
fact, plaintiff never complained of a problem with lifting except
in connection with her disability application, i.e., in her
administrative paperwork and in her hearing testimony.  She never
told any doctor that she had difficulty lifting.  Dr. Henry found
that plaintiff could lift 20 pounds occasionally and ten pounds
frequently.  Dr. Langguth's finding is not supported by his own
medical records, any objective findings, or any other medical

38

records.

Dr. Langguth found that plaintiff would be likely to miss four days or more per month of work due to her impairments and treatments. However, in the 19 months before he wrote that, he had seen plaintiff only six times and the majority of the medical records from his office indicate that the appointment time was approximately 15 minutes. There is no evidence that plaintiff had any other medical appointments during that 19 months. In fact, plaintiff went seven months in between appointments in 2008. There is no evidence in any of Dr. Langguth's records that plaintiff was bedridden or otherwise incapacitated during that 19 months, not at all much less for four or more days per month. There is simply no basis whatsoever in the record for his opinion that plaintiff would miss that much work due to her impairments and/or treatment.

Because Dr. Langguth's opinion is not supported by his own medical records, is not supported by any objective findings, and is not supported by any of the other evidence in the record, the ALJ did not err in discounting it.

## VIII. STATE CONSULTANT'S OPINION

Plaintiff argues that the ALJ erred in failing to consider the opinion of State consultant Dr. Henry. However, plaintiff fails to explain what part of Dr. Henry's opinion would have

benefitted her.  Dr. Henry found that plaintiff could lift 20 pounds occasionally and ten pounds frequently; stand or walk about six hours per day; sit for about six hours per day; had an unlimited ability to push or pull; could frequently climb, stoop, kneel, crouch, or crawl; and could only occasionally reach overhead with both arms but had an unlimited ability to handle, finger or feel.  She had no environmental limitations except that she should avoid concentrated exposure to hazards such as machinery and heights.  The only real limitation here is her ability only to occasionally reach overhead with both arms – and I note here that even plaintiff's treating physician Dr. Langguth found that she could reach without limitation.

Dr. Henry's assessment does not support a finding of disability.  Because plaintiff has failed to explain how she thinks this opinion supports her position, I see no need to analyze Dr. Henry's opinion further.

### IX.  MYOFASCIAL PAIN SYNDROME

Plaintiff argues that the ALJ erred in failing to consider plaintiff's myofascial pain syndrome to be a severe impairment. Plaintiff's only explanation in support of this argument is that she was diagnosed with this impairment on one occasion, and her burden is de minimus.  She fails to explain how she is limited by myofascial pain syndrome.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

> (a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

> (b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

>> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

>> (2) Capacities for seeing, hearing, and speaking;

>> (3) Understanding, carrying out, and remembering simple instructions;

>> (4) Use of judgment;

>> (5) Responding appropriately to supervision, co-workers and usual work situations; and

>> (6) Dealing with changes in a routine work setting.

As I mentioned, plaintiff failed to specify what basic work activity was limited by myofascial pain syndrome. Further, plaintiff was never actually diagnosed with this condition. Dr.

Harbach indicated that plaintiff's pain was mainly myofascial in nature and that she could be helped with sacroiliac joint injections and physical therapy.  However, there is no indication in the record that plaintiff ever received physical therapy treatment.  It is well settled that failure to follow a prescribed course of treatment, without good reason, is grounds for denial of disability benefits, as well as a basis for discrediting subjective complaints of pain.  20 C.F.R. § 404.1530(b); Clark v. Shalala, 28 F.3d 828, 831 & n.4 (8th Cir. 1994); Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993); Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989).

## X.    THIRD-PARTY TESTIMONY

Plaintiff argues that the ALJ erred in ignoring the third-party testimony of Lesa Hashagen, Richard Mitchell, Roy Sypolt, and Beverly Roberts who provided written statements.

On August 9, 2006, the Social Security Administration issued Social Security Ruling (SSR) 06-3p, 71 Fed.Reg. 45,593 (Aug. 9, 2006).  The ruling clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources."  SSA separates information sources into two main groups: "acceptable medical sources" and "other sources."  It then divides "other sources" into two groups:  medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007).

Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007).  According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1.  Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment.  Id.

2.  Only acceptable medical sources can provide medical opinions.  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3.  Only acceptable medical sources can be considered treating sources.  20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p.  Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007).

43

"Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." <u>Id</u>. quoting SSR 06-3p.

The courts have criticized the Social Security Administration for failing to discuss third-party statements. <u>Basinger v. Heckler</u>, 725 F.2d 1166, 1170 (8th Cir. 1984). However, the fact that the courts have made this criticism on a regular basis does not mean that in every case the failure of an ALJ to analyze the credibility of third-party witnesses remand is automatic. For example, in <u>Young v. Apfel</u>, 221 F.3d 1065 (8th Cir. 2000), the court held that the ALJ "implicitly" evaluated the testimony of the claimant and her witnesses by evaluating the inconsistencies between her statements and the medical evidence.

> [B]ecause the same evidence also supports discounting the testimony of Young's husband, the ALJ's failure to give specific reasons for disregarding his testimony is inconsequential. <u>See</u> <u>Lorenzen v. Chater</u>, 71 F.3d 316, 319 (8th Cir. 1995) (arguable failure of ALJ specifically to discredit witness has no bearing on outcome when witness's testimony is discredited by same evidence that proves claimant's testimony not credible). Finally, we find that the ALJ did not discredit the statements of Young's friends merely on the grounds that they were not medical evidence; rather, the ALJ observed that the statements were devoid of specific information that could contradict the medical evidence regarding Young's capabilities during the relevant time period.

<u>Id</u>. at 1068-1069.

See also <u>Carlson v. Chater</u>, 74 F.3d 869, 871 (8th Cir. 1996); <u>Bates v. Chater</u>, 54 F.3d 529, 533 (8th Cir. 1995).

In this case, Lesa Hashagen said plaintiff has problems sitting and standing. However, she did not indicate in her one-paragraph statement, how often she observes plaintiff. Because plaintiff herself testified that she has problems sitting and standing, the ALJ's reasoning for discrediting plaintiff's testimony about the extent of her difficulty sitting and standing applies equally to the statement of Ms. Hashagen.

Richard Mitchell wrote that plaintiff cannot sit comfortably or stand without pain, she has problems walking more than 20 feet at a time, and she cannot lift more than three or four pounds. Again, there is no basis for his knowledge – he does not indicate how often he sees plaintiff. And again, his statement mirrors plaintiff's which was thoroughly addressed by the ALJ.

Roy Sypolt was referred to as plaintiff's "roommate" even though she married him prior to the appeal to federal court. He obviously has a financial interest in the outcome of this case. In addition, plaintiff testified that Mr. Sypolt himself is receiving disability benefits; however, she could not identify his disability other than saying he is illiterate, which clearly would not disable someone from any type of gainful activity. Mr.

Sypolt reported that plaintiff is unable to keep up with all the household chores, she is always in pain, she is up and down throughout the night, and she is upset because she feels like her kids are being cheated since she cannot be a "normal" mom. Mr. Sypolt did not indicate what a "normal" mom was able to do that plaintiff could not.

The ALJ's analysis as to plaintiff's ability to do household chores and her pain level applies equally to Mr. Sypolt's statement.

Beverly Roberts stated that she hardly gets to see plaintiff anymore. That statement alone renders her testimony irrelevant as she has no current basis for her evaluation of plaintiff's abilities.

## XI. MEDICAID FINDING

Plaintiff argues that the ALJ erred in failing to consider the fact that Missouri Medicaid had found plaintiff disabled.

The ALJ should consider another agency's finding of disability, Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998), but the ALJ is not bound by the disability rating of another agency when he or she is evaluating whether the claimant is disabled for purposes of Social Security benefits. Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006), citing 20 C.F.R. § 404.1504; Fisher v. Shalala, 41 F.3d 1261, 1262 (8th Cir. 1994)

(per curiam).  Where an ALJ does not mention another agency's finding of partial disability, there is no error if the ALJ fully considered the evidence underlying that agency's final conclusion regarding disability.  Pelkey v. Barnhart, 433 F.3d at 579. Furthermore, whether an applicant meets Social Security eligibility requirements is "an inquiry that is different from a state's Medicaid eligibility requirements".  Ramey v. Reinertson, 968 F.3d 955, 962 (10th Cir. 2001).

Plaintiff has failed to establish on what basis she was found disabled by Medicaid.  There was absolutely no evidence of that before the ALJ.  Plaintiff did, however, submit evidence of her obtaining a disabled placard for her car.  Dr. Langguth signed a Physician's Statement for Disabled License Plates/ Placard on August 29, 2009.  He checked a box next to: "The person cannot ambulate or walk 50 feet without stopping to rest due to a severe and disabling arthritic, neurological, orthopedic condition, or other severe and disabling condition."  He noted that the disability was temporary, not permanent, and wrote in "3/1/09" as the expiration date for the disability.  The disability, according to Dr. Langguth which was the basis for the Medicaid finding, did not last for 12 continuous months.  Aside from the other problems with Dr. Langguth's finding, this alone is a basis for not considering the disability finding of the

agency who issued the disabled placard.

The fact that plaintiff is on Medicaid does not, without more, establish that plaintiff is disabled under the Social Security Act.  Plaintiff fails to explain how that would be so in this case, and I find that it is not.

## XII. PLAINTIFF'S RFC

Plaintiff argues that the ALJ erred in finding that plaintiff can do the full range of sedentary work without significant nonexertional impairments and improperly relied on the medical vocational guidelines.  "[T]he ALJ erred in providing a generalized RFC finding of sedentary rather than a specific function-by-function RFC."  Plaintiff also argues that she suffers from substantial pain, nausea, and dizziness, which are nonexertional impairments.

After reviewing the medical and other evidence of record, the ALJ concluded that plaintiff could perform a full range of sedentary work as that term is defined by the agency's regulations (Tr. 14-17).  Those regulations and rulings clarify that "sedentary work" involves lifting and carrying ten pounds, and standing and/or walking two hours and sitting six hours in an eight-hour day.  See 20 C.F.R. § 416.967(a); SSR 96-9p, 1996 WL 362208.  Therefore, by finding that plaintiff could perform the full range of sedentary work, the ALJ believed that plaintiff's

functional limitations included lifting and carrying ten pounds, standing and/or walking two hours per eight-hour day, and sitting six hours in an eight-hour day. The ALJ simply was not required to do more. See Cook v. Astrue, 629 F. Supp. 2d 925, 933 (W.D. Mo. 2009) (finding that the ALJ's RFC assessment for the full range of light work satisfied the ALJ's obligation under SSR 96-8p to perform a function-by-function assessment of the claimant's ability to perform work-related activities).

As far as the ALJ's use of the medical vocational guide-lines, I find that the ALJ did not err. Plaintiff's pain, according to the ALJ's findings, was not so severe as to limit her ability to do the full range of sedentary work. Plaintiff's subjective allegations of disabling pain were properly found not credible and the ALJ considered only that level of pain he found credible. Plaintiff testified at the hearing that she does not experience dizziness (she testified that occasional nausea was her only side effect) and that her nausea occurs once or twice a week and resolves once she eats something.

20 C.F.R. Pt. 404, Subpt. P., App. 2, Table 1, Rule 201.25 directs a finding of "not disabled" if the claimant can perform the full range of sedentary work, is between 18 and 44 years of age, and has a limited education with no transferrable skills. See also Carlock v. Sullivan, 902 F.2d 1341 (8th Cir. 1990)

("Because the ALJ committed no error in concluding that Carlock's nonexertional impairment (pain) did not preclude him from engaging in the full range of light work, application of the Guidelines was appropriate.").

## XIII. CONCLUSIONS

Based on all of the above, I find that plaintiff's arguments are without merit and are unsupported by the record as a whole. I further find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_____/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 17, 2011